THE PRESIDENT, DIRECTORS AND COMPANY OF THE NORTHERN BANK OF KENTUCKY *v.* GEORGE W. SQUIRES.

The only formality required by law to make absent creditors parties in cases of voluntary surrender under the Acts of 1817, is the appointment of Counsel to represent the absent creditors.

The order of a Court of this State, made under the authority of a law of this State, accepting a surrender of an insolvent's property, and staying all proceedings against him, precludes any creditor from instituting a suit in a Court of this State—unless the law itself is a nullity.

The State, in its sovereign capacity, can exercise the fullest authority over its own tribunals, and prohibit citizens of other States from suing in them on contracts made either in or out of the State, unless there is some superior power by which her authority in this respect is circumscribed.

The insolvent laws of this State expressly extend their operation to all persons, whether citizens of other States, or foreigners, and all contracts are declared to be affected by them, whether made in, or out of the State, or to be performed in, or out of the State.

It is settled by judicial authority:

1st. That the insolvent, or bankrupt laws of a State, if not suspended by the enactment of an uniform bankrupt law by Congress, are constitutional and valid as to all posterior contracts entered into between citizens of the State where such laws exist, and equally so whether they affect the obligations, or the remedy.

2d. That a discharge, under such laws, as between citizens of the State where the discharge is granted, and as to contracts made and to be executed there, is valid and binding everywhere.

3d. That it is only in regard to contracts made between citizens of different States, and not stipulated to be performed in the State where the discharge is granted, that the validity of such discharge can be questioned, if at all, in the Courts of the State where it was granted; although in the Courts of the United States, according to their existing jurisprudence, a discharge, under these circumstances, would not be held good as a plea in bar.

A bill of exchange drawn by a citizen of Louisiana, upon and accepted by citizens of Louisiana, and payable to the order of a citizen of Louisiana, will be understood as intended to be made payable in Louisiana, if no stipulation to the contrary appear.

It is well settled that State insolvent laws discharging the obligation of future contracts, are constitutional. (SLIDELL, C. J.)

Where a bill of exchange is accepted by a merchant living and transacting his business in Louisiana, the reasonable expectation of all parties must be that it is to be paid in Louisiana. (SLIDELL, C. J.)

I cannot understand by what right the transferee of a Louisiana creditor can ask a Court of Louisiana to disregard its own insolvent laws and violate a *cessio bonorum*, and a stay of proceedings, regularly adjudged in a Court of Louisiana. Such a doctrine, it seems to me, would involve principles subversive of State sovereignty, and for which I can find no sufficient warrant in the constitution of the United States, (SLIDELL, C. J.)

APPEAL from the Third District Court of New Orleans, *Kennedy, J. Bonford & Finney*, for plaintiff and appellant. *Sidney L. Johnson*, for defendants.

The following printed arguments were filed:

*Bonford & Finney*, for plaintiff:

The defendant, in his written argument, has labored to show that the insolvent act, so far as he claims the benefit of it, is a mere modification of the remedy, and does not affect the obligation of the contract.

Our Supreme Court, however, has decided the same point against him, in the case of *Fisher, Burgess et al*, v. *Wheeler & Ellis*, 5 Ann. Rep. 271.

In the case of *Boyle* v. *Zacharie*, 6 Pet. 635, *Zacharie* had obtained a judgment against *Boyle* in the State of Maryland, after *Boyle* had taken the benefit of the insolvent act of that State. It was not pretended that the debt was discharged. Many years afterwards *Zacharie* caused an execution to be levied on a ship which *Boyle* had acquired after his surrender. *Boyle* enjoined the proceedings, on the ground that the insolvent proceedings exempted such property as he might thereafter acquire, from seizure for debts contracted before his surrender.

The Supreme Court of the United States held, that so far as the Maryland Act, and proceedings under it, operated to protect the property of *Boyle* from *Zacharie's* execution, they were invalid and in contravention of the constitution of the United States.

Our State law not only exempts all the future acquisitions of the insolvent from execution; but perpetually enjoins all actions at law, except the futile one of forcing a new cession. Moreover, so much of the subsequent acquisitions of the insolvent as may be necessary for his support and the maintenance of his family, is exempt from all liability whatever for debts contracted before the cession. This provision covers a handsome fortune.

Such a law appears to us to destroy the vital principle of the obligation, deprive it of all value, paralize its legal effect, and leave but an abstract right, without any legal sanction. There can be no right without a remedy. To destroy the remedy, or so impair its exercise as to make it ineffectual, destroys or impairs the right itself.

· 1 How. S. C. R. 311, *Bronson* v. *Kinzie et al.*
8 Wheaton, 1, *Green* v. *Biddle.*

We consider ourselves protected from the insolvent proceedings pleaded against us in this case, by the constitution of the United States, and the following decisions:

12 Wheaton, 213, *Ogden* v. *Saunders.*
12 Wheaton, 369, *Shaw* v. *Robbins.*
8 Pick. 194, *Braynard* v. *Marshall.*
5 Mass. 509, *Baker* v. *Wheaton.*
10 Mass. 337, *Watson* v. *Bourne.*
6 Pet. 635, *Boyle* v. *Zacharie.*
5 How. S. C. R. *Cook* v. *Moffatt.*

This case cannot be distinguished in any respect from the case of *Braynard* v. *Marshall*, 8 Pick. And the doctrine of that case is fully supported by the opinions delivered in the cases cited from 5 Mass. 10 Mass.

The defendant's counsel has endeavored to distinguish this case, however, from the case of *Ogden v. Saunders*, and *Shaw* v. *Robbins*, in this—that in those cases the bill was payable, in its inception, to a citizen of a different State from that in which it was made and the insolvent proceedings were had. Whereas, the counsel insists that the bill in this case was payable to and discounted by a citizen of the State in which it was made, and the insolvent proceedings had.

We see no force in the distinction. But we will first state the facts as we understand them. The bill was created, just as the plaintiff purchased it, for the purpose of being sold to any person whatever, without regard to his citizenship or domicil. The plaintiff traces title through *Mr. Taylor*, the last endorser. The drawing, endorsing and accepting the note, were all one act, by which a security was made to be sold in the market for the benefit of the drawer. Neither the drawer or endorser ever had any right of action on the bill—and, as among the original parties, it represented no debt whatever.

There is no force then in the argument that the bill is subject to the insolvent laws of this State, because it was originally payable-to one of its citizens. For, as between that payee and the other parties, there never was any debt or obligation to be affected by the insolvent laws of this State. But it is said the bill was once held by *Mr. Hunton*, a citizen of this State. We are not informed who first discounted it. It may have been first discounted by a citizen of some other State. *Mr. Hunton* is no party to the bill, and we derive title, not from him, but from *Mr. Taylor*. Nor does it appear that the officers of the bank, who discounted it, knew that *Mr. Hunton* ever had been its owner. It was

offered for sale by *Mr. Trotter* through a friend. The officers probably never enquired or understood to whose benefit the proceeds were to go.

See Story on prom. notes, sect. 193.

The bill in its concoction was endorsed in blank by *Miles Taylor*, and thus was made payable to bearer. In this condition it was offered for sale; and can no more be said to have been payable to a citizen of this State than a bank note. It was contrived in that form for the express purpose of being conveniently circulated, and to represent a debt due to any holder.

Suppose the bill had been discounted by a citizen of another State, (as it may have been for aught that we know,) would the fact that *Mr. Hunton* had once owned it, although he left no trace of his ownership, defeat the plaintiff's action, by interposing the bar of the insolvent proceedings?

But conceding the fact to be as assumed by the learned counsel, that the debt was created in the State of Louisiana, and between citizens of this State—we deny the conclusion, viz: that we hold the bill subject to the same conditions which attended it in the hands of the transferror.

In the decisions of the cases of *Saunders* v. *Ogden*, and *Shaw* v. *Robbins*, no stress was laid upon the fact that the bills were originally made payable to, or given to, citizens of other States than those in which they were drawn. The decisions proceeded upon the ground that the insolvent proceedings had no effect beyond the limits of the State in which they were had, and could not affect the rights of citizens of other States. This principle covers the present case.

The fact that the bill was made payable to a citizen of this State, or originally discounted by a citizen of this State, might be supposed to subject it, in its effect and construction, to the laws of this State. But this would be equally true of a bill made in this State, though payable to a citizen of another State. The bill sued upon in *Saunders* v. *Ogden* was as much subject in its effect to the laws of New York, as though it had been made payable to a citizen of that State. It is not the person to whom a note or bill is made payable that determines what law shall determine its effect and construction. It is the place where it is made. But the constitution of the United States is the paramount law of all the States. And according to that instrument, as expounded in *Saunders* v. *Ogden*, and other cases cited, a bill or note created in any one State, cannot be extinguished or impaired by any insolvent proceedings in that State, when, at the time of the insolvent proceedings, the paper should happen to belong to a citizen of another State. This is the *lex loci contractus*, or at least, a part of that law. It is as much a part of the law of Louisiana as any law on her statute book.

When the question is whether a bill or note is discharged or affected by judicial proceedings, it is not considered important to enquire who was the payee, and whether he was a party to those proceedings. But the proper enquiry is, who was the holder at the time of those proceedings, and was he a party to them? Was he amenable to the jurisdiction of the Court? Is he bound by its judgment?

It is insisted that we only acquired the right of the person from whom we bought the bill. It is enough for us that we did acquire his right. We purchased the bill for valuable consideration before its maturity, without notice of any defence, and might perhaps have purchased more than the rights of the person who sold to us. But it is enough that we acquired from him a right to demand and receive the amount of the Bill from any prior party. This is precisely what the seller transferred to us. The defendant's counsel insists, however, that he transferred more or less than this, viz: his own liability to be made a party to and affected by certain judicial proceedings in this State. We do not admit that there was any such condition to the transfer. It was not express, nor does it result from legal implication. The position of the defendant is: that because *Mr. Hunton*, from whom we bought this bill, was liable by his domicil to be made a party to the cession and to be bound thereby, we, by buying the bill from him, are to be deemed parties to the cession to which he might have been made a party, and to be bound by those proceedings without being parties. The insolvent proceedings are a species of remedy to which *Mr. Hunton* might have been subjected in favor of his debtor, had he continued to be the holder of the debt. He would have been subjected by reason of his domicil. But this was a mere personal inconvenience on his part—a mere sub-

jection to the Courts of his domicil which did not attach to the paper transferred.

There is no inherent liability in the paper to be discharged by the insolvent laws of this State. Its liability to be so discharged when it exists at all, is not in the paper, but in the subjection of the holder by reason of his domicil and other circumstances, to the jurisdiction of the Courts of the country where the paper was created. And the fact that there is no such inherent quality of the paper is apparent from the admitted principle of international law, that no foreign country is bound to give effect to the insolvent laws of the place of the contract, or any proceedings under it. And if the insolvent law entered into the contract and formed a part of it, every Court of every country would be bound so to interpret it. See opinions of *Judges Taney* and *Grier*, in *Cook* v. *Moffatt*; the opinion of *Chief Justice Marshall* in *Saunders* v. *Ogden*, and the argument of *Mr. Webster* in the same cause. Indeed, in this latter case, the idea that the insolvent law of the place of the contract entered into and formed part of the contract, was carefully examined and completely refuted. We understand that case to have decided that the insolvent laws of the place of the contract did not enter into the contract; that there was no inherent quality in the debt, which subjected it to the operation of those insolvent laws, or the proceedings of the Courts of the place of contract under those laws; and that the liability of the debt to be affected by those laws and those proceedings was not an inherent quality of the debt itself, but depended on the domicil and subjection to jurisdiction of the owner of the debt. Indeed, in the case of *Ogden* v. *Saunders*, the argument for the defendant *Ogden* was, that the contract was made in the State of New York, as it undoubtedly was in point of fact, and that the insolvent laws of that State entered into and formed part of it. And this doctrine was refuted in the decision of the Supreme Court.

We beg pardon for so much argument, or, at least, discussion, on a matter which has been already so much discussed by such able persons.

The very question here presented was decided in our favor in 8 Pick. 194. The cases of *Watson* v. *Bourne*, and *Baker* v. *Wheaton*, affirm the same doctrine; and the reasoning of the Court and the principle of the decision in *Saunders* v. *Ogden*, in our judgment, entirely support us.

*Johnson*, for defendant.

The first question to be considered is, What is the law applicable to the contract sued on? Is it a Louisiana contract? Of this there can hardly be a question. It would be difficult to say under what law it was created, if not under that of Louisiana. We do not understand the plaintiffs to contend that, because the present holders are domiciled in Kentucky, the contract is a Kentucky contract. They have not asked the acceptors to pay them six per cent. interest, according to the laws of Kentucky. They have asked for five per cent. according to the law of Louisiana. The plaintiffs seek to ignore the real facts of the case, and, looking at the names on the bill, say that they have title through *Mr. Taylor*, the last endorser, and have no knowledge of *Mr. Hunton* as a party to it. Be it so. Then, on the face of the bill our contract was with the drawer and payee, citizens of Louisiana, the State in which the bill was dated, accepted and endorsed. *Laforest & Squires*, a mercantile firm doing business in New Orleans, having a mercantile domicil there, and no where else, were drawn upon there, by a citizen of Louisiana, accepted there, payable to a citizen, and by intendment of law, were to pay there on presentment of the bill there at maturity. The plaintiffs caused the bill to be presented to them there for payment, and protested for non-payment, and the drawer and endorsers on the bill were notified of protest at their domicils in Louisiana.

Any other presentment would have been bad, and would have discharged the drawer and endorser. So, also, any other notice of protest than one made to the drawer and endorsers at their domicils in Louisiana. If the plaintiffs, dissatisfied with the conclusions which result inevitably from looking at the bill alone as ordinary commercial paper, begin to inquire for other facts to modify these conclusions, they cannot select part of these facts for their use, and reject others which are inconvenient. They cannot discover that *Taylor* and *Winchester* were accommodation endorsers, who, beyond putting their names to the paper, had nothing to do with putting it in circulation, and still continue to suppress *Mr. Hunton*, with whom alone, through their agent, they contracted for

NORTHERN BANK OF KENTUCKY v. SQUIRES.

41

the purchase of the bill. The knowledge of their agent, *Mr. Trotter*, was their knowledge.

It is idle to suppose that the bill may have been discounted by somebody else before *Mr. Hunton*. If such had been the case, and plaintiff had any interest in showing it, he would have done so. The defendant did not endeavor to shelter himself under the favorable inferences which might be drawn from the form of the bill, but himself alleged and proved the real facts of the case. It is assumed to be fully proved that the defendant and other parties to the bill contracted directly with *Mr. Hunton*, the first purchaser of the bill, and that this contract was a Louisiana contract, made between the citizens of Louisiana, and subject, in all respects, to Louisiana law.

Such being the facts, we make the following points:

I. Even if the contract had been discharged under our insolvent laws, it would be no violation of the Constitution of the United States, inasmuch as the contract was made in the State of Louisiana, between citizens of that State, and was to be performed therein, and is to be governed by the laws of that State in existence at the time the contract was made, among which was the insolvent law in question. The sale of the bill by *Mr. Hunton* to the plaintiffs was another contract, which could not change the nature of the obligation of defendant. By it the plaintiffs acquired the right of the assignee against the defendant, and nothing more.

It would be presumptuous to attempt to offer an argument in support of these propositions, when we have that of Story in sections 166, 167, 168, 169, 170, also section 158, in his work on Bills. He there comments on ths case of *Braynard* v. *Marshall*, in 8th Pickering, p. 194, and compares it with a previous decision of the same Court in *Blanchard* v. *Russell*, 13 Mass., 1. In reading these remarks of Story, it should be recollected that he was one of the Judges who, in the case of *Ogden* v. *Saunders*, took the highest ground against State insolvent laws, and that he delivered the opinion in *Boyle* v. *Zacharie*, in which the Court took occasion to affirm the decision in *Ogden* v. *Saunders*.

In 1st Kent, p. 465, ed. 1851, [*422, former editions,] the result of the decisions of the Supreme Court is well and accurately summed up in these words:

"It remains yet to be settled whether it be lawful for a State to pass an insolvent law which shall be effectual to discharge the debtor from a debt contracted after the passing of the act, and within the State making the law. The general language of the Court would seem to reach even this case; but the facts in those cases decided do not cover the ground, and the cases decided are not authority to that extent. [6th note.] It will be perceived that the power of the State is exceedingly narrowed and cut down; and, as the decisions now stand, the debt must have been contracted after the passing the act, and the debt must have been contracted within the State and between citizens of the State, or else a discharge will not extinguish the remedy against the future property of the debtor."

In note 6 to the above passage it is said that, in *Bronson* v. *Kinzie*, 1 How. 311, it was conceded that contracts made subsequent to the stay laws in Illinois were to be governed by them, if made to be executed in the State.

The case of *Ogden* v. *Saunders* is not inconsistent with the doctrines of Kent and Story, and is not like that before the Court. The bill sued on was drawn by *Jordan*, of Kentucky, in favor of *Saunders*, of Kentucky, on *Ogden*, of New York. (Compare the first and fourth findings of the special verdict at the beginning of Judge Johnson's opinion, 12 Wheat. 271.) Although the acceptance was made in New York by one residing there, on whom the bill was drawn, the other contracting parties were not citizens of that State, and, except by drawing and taking a bill on a citizen of New York, had not in any way subjected themselves to the operation of the New York laws.

Still, in a scientific and philosophical point of view, it was a New York contract, so far as *Ogden* was concerned, and the decision was in derogation of the general principle that the *lex loci contractus* is to govern, unless when a place of performance different from that of contract is contemplated. It is from this abandonment of a general principle, which alone furnished a safe guide, that so much doubt and difficulty have been found in the application of the case of *Ogden* and *Saunders*.

It has been considered a rule for the particular forum, the Federal Court—or the Courts of States, other than that which granted the discharge—rather than

a principle of law, to be followed by all Courts alike. In this connection, a remark of great significance, respecting the array of authorities on which the counsel for plaintiffs stakes his case, will be found applicable to them all. In none of them were State Courts called upon to nullify their own insolvent laws. In most of them it was more or less explicitly assumed that the State Courts were bound to give effect to their own insolvent laws, as the extent and nature of the remedy to be afforded were governed by the laws of the forum in which the remedy was sought. On this point, and many others, no more instructive case can be referred to, than that of *Town* v. *Smith*, 1 Woodbury & Minot's Rep., pp. 118, 137, decided by *Judge Woodbury*, as Judge of the United States Circuit Court of Massachusetts, in which he reviews rather briefly and abstrusely, but ably, the decisions and principles applicable to discharges under State insolvent laws.

The decision in *Cook* v. *Moffat*, 5 How., 307, which, says *Judge Grier*, is ruled by *McMillan* v. *McNeil*, 4 Wheaton, 209, is not at variance with any principle we contend for, and the opinion of *Judges Grier*, *Taney*, *Daniels* and *Woodbury*, certainly do not indicate any disposition to go beyond the case of *Ogden* v. *Saunders*. It is well to observe that both the facts and the points of *Ogden* v. *Saunders*, are inaccurately stated by *Judge Grier*, in the case of *Cook* v. *Moffat*.

On principle and authority it is believed that the point we commenced with, must be conceded.

II. The State law, so far as it applies to defendant, and is set up by him in defence to this action, is a simple modification of the remedy, in no manner affecting the obligation of the contract, which it leaves in full force. It does not fall under any restriction contained in the Constitution of the United States. Even this modification of the remedy is not by a law posterior to a contract, but by one long prior to it, analogous to appraisement laws, to laws exempting tools and other property from seizure, which have never been deemed repugnant to the Constitution of the United States in their effects on debts contracted after their existence.

Since imprisonment for debt was abolished by the act of 1840, a surrender, or *cessio bonorum*, such as that set up in defence in this case, has no other effect in favor of the debtor who makes the surrender, than the modification of the remedy against his future property, provided for in the latter part of Art. 2173, and in the 28th Sec. of the Act of 1817. This modification was nothing more than a declaration of the existing law, the Spanish law, which had prevailed in Louisiana since 1769. It had its origin in the Roman law, Makeldey, liv. 6; it was re-enacted in Spain in law 3, tit. 15 of the 5th Partida, and is stated in Tapia Febrero in few words to the same extent and effect as under our Code. Tapia Febrero Lib. 111, Tit. IV, Cap. 1 §13. Carried to the extent which we claim for it in this case, it has never been held repugnant to the Constitution of the United States. See the reasoning of Judge Matthews, in *Ray* v. *Cannon*, 2 N. S. 30.

In *Sturgess* v. *Crowningshield*, 4 Wheaton, 419, Chief Justice Marshall held that an insolvent law which discharged only the person of the debtor, leaving his obligation in full force, was not repugnant to the Constitution. In another passage, he said : " Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation may direct."

But, in our case, no remedy has been changed since the contract was made. By the surrender of the property of the defendant we have arrived at a gradation in the remedy which was provided for by the Code of 1825, and the Act of 1817, long before the contract was made. As, before the surrender, certain things were exempted from seizure, so now, since the surrender, a larger portion of the new acquisitions is exempted therefrom, and the creditor is obliged to allege and prove the facts which authorize the action for a new surrender. *Vauquelin* v. *Platet*, 12 R. 382. *Plympton* v. *Preston*, 4 An. 356. Priority is, moreover, most equitably given to new creditors. C. C. 2173, Sec. 28, Act 1817.

The present suit is an endeavor to induce our own Courts to defeat the policy of a law of the State which " was certainly conceived," to use the language of the Court in *Plympton* v. *Preston*, 4 A. 359, " as much in a spirit of mercy to the debtor, as of justice towards his creditors."

Our own Courts are called upon to declare this modification of the remedy a violation of the Constitution of the United States, although like the appraisement law and the law exempting certain articles from seizure from debt, it existed long before the contract was made, the obligation of which it is said to have impaired. Not one of the cases quoted by the counsel for the plaintiffs

affords a precedent for the decision which he now asks of the Court. In the case of *Fisher* v. *Wheeler*, 5 A. 271, which is confidently quoted as settling this point against us, our Supreme Court says: "The question on which this case has been presented in the argument of counsel, is whether *King* and *Fisher* are bound by the insolvent proceedings, had in New Orleans—they, as well as the defendants, having been citizens of the State of Missouri at the time of the making of the note, and the note having been executed and made payable in the said State. The case has been argued by the counsel on both sides as resting on authority, *and the argument has been confined to the authorities cited*.

"We think the rule to be settled that the State insolvent laws do not extend to a contract made in another State, and to be there executed between citizens of other States; and that a discharge under these laws does not extinguish the remedy against the future property of the debtor who has taken the benefit of them. The point has been repeatedly decided in express terms. *Witt* v. *Follett*, 4 Wendell, 458, and cases cited by counsel. 2 Wendell, 458, same case.

    \*      \*      \*      \*      \*      \*      \*      \*      \*

"The defendants obtained no discharge from their creditors, but have pleaded their application for the benefit of the insolvent law, the acceptance of the cession of property, and the stay of proceedings ordered by the District Judge on accepting the cession, which raises the question before stated, whether the plaintiffs are bound by the insolvent proceedings of the defendants.

"It seems to follow necessarily from the rule above stated, as the plaintiffs did not attempt to reach the property vested in the creditors by the cession made by the insolvents, but merely asked for judgment on their debt, the proceedings in insolvency are no legal impediment to their action."

It is evident that the only point ruled by the Court is one we all admit, that contracts made and to be executed in one State, between its citizens, cannot be discharged by the insolvent laws of another State. The distinction between a law discharging a contract, and one affecting the remedy, was not clearly presented in argument, and was in no manner considered or decided upon by the Court.

The counsel for plaintiff then cites *Boyle* v. *Zacharie*, 6 Peters, 635, and asserts, very inaccurately, if we may attach faith to the argument of *Mr. Wirt*, for the appellant, (p. 638, §2,) that it was not pretended that the debt was discharged. It was most seriously contended that the debt was discharged by Maryland insolvent laws, as being a Maryland contract. It was decided (*Judge Story* giving the opinion of the Court, and no one dissenting,) that it was a Louisiana, and not a Maryland contract, and therefore unaffected by the insolvent act of the latter State.

The counsel for plaintiffs say that "to destroy the remedy, or so to impair its exercise, as to make it ineffectual, destroys or impairs the right itself." In support of this doctrine, which we have no concern with, he quotes *Bronson* v. *Kinzie*, 1 Howard, S. C. R., 311, and 8 Wheaton, 1, *Green* v. *Biddle*.

In both these cases the Legislature had passed acts subsequent to the contracts, which destroyed or impaired the remedies existing at the time the contracts were made. It is difficult to see their application to the present case, in which the defendant invokes the aid of no law subsequent to his contract. It may be well, however, to quote here what Chief Justice Taney, in *Bronson* v. *Kinzie*, says of the effect of the stay laws of Illinois, on posterior contracts:

"Mortgages made since the passage of these laws must undoubtedly be governed by them; for every State has the power to prescribe the legal and equitable obligations of a contract to be made and executed within its jurisdiction. It may exempt any property it thinks proper from sale for the payment of a debt; and may impose such conditions and restrictions upon the creditor as its judgment and policy may dictate. And all future contracts would be subject to such provisions; and they would be obligatory upon the parties in the Courts of the United States, as well as those of the State. We speak, of course, of contracts made and to be executed in the State. It is a case of that description that is now before us, and we do not think it proper to go beyond it."

If the defendant in this case had been sued in Kentucky, it is not pretended that his cession in Louisiana would avail him there, nor in any other State of the Union, in which he or his property might be found, for the simple reason the cession has not operated a discharge of the debt, but merely a modification of the remedy. The Courts of Louisiana alone are bound to give it effect.

Not a single case has been cited in which a State Court has refused to be governed by its own insolvent laws when applied to contracts made under them; not one in which it has been held that such laws should not be applied in the Courts of the State. All of the cases relied upon by the plaintiffs were either in Courts of the United States, or in Courts of States other than those in which the insolvent proceedings, set up in defence, had taken place. Nearly all of them assume that the Courts of the State in which the insolvencies occurred would be bound to give them effect. It is admitted that if *Mr. Hunton* had continued to hold the bill sued on, he would be bound by the cession. By his having passed it to a foreign holder it is contended that the law of this case is changed.

When it becomes known that by assigning a Louisiana contract to a foreigner or a citizen of another State, he is enabled to defeat in our own Courts the beneficial intention of the State insolvent law, bills and notes, as well as cotton and sugar, will become regular articles of Louisiana export.

The importance of this suit to the defendant is far beyond the amount involved. If this suit is successful, he knows not how many others will follow it; enough, at any rate, to darken his prospects, to paralyse his industry, to destroy all hopes of a provision for the education and support of his family. This will all take place without any advantage to the creditor.

The Constitution of the United States is invoked to produce this result. We think we have shown that this is not a *dignus vindice nodus*, that there is no call for the interposition of any constitutional prohibition, and that this is a case where, if ever, the humane policy of the State should be carried into effect by its Courts.

In conclusion, we call the attention of this Court to the able opinion in our favor of the District Judge.

*Bonford & Finney*, for plaintiffs.

The brief already filed by us in this case was prepared for the inferior Court, in answer to a short manuscript argument handed the Judge by the counsel for the defendant. The brief filed in this Court, in behalf of the defendant, is his counsel's reply to our answer to that first manuscript argument. This explanation is necessary to understand the allusions of counsel to each other's briefs.

The defendant, in the lower Court, had argued that the insolvent acts, so far as he claims their benefit, were an admissible modification of the remedy, and not a law impairing the obligation of the contract, within the meaning of the tenth section of the first article of the Constitution of the United States. In our brief we referred to your honors' decision in the case of *Fisher, Burgess & Co.* v. *Wheeler & Ellis*, 5 Ann. 271, as deciding this point adversely to the defendant. The counsel for the defendant denies that any such decision was made in that case, and in order to prove it, has quoted in his brief a part of that opinion. But in his quotation there is an hiatus, indicated by stars, indicating that a paragraph has been omitted. That omitted paragraph shows at once that your decision did turn upon the conflict of the insolvent laws, in respect of their effect in perpetually enjoining the action of the creditors, with the Constitution of the United States. The defendants in that case claimed the same benefit from the insolvent proceedings, which is claimed by the defendant in the present case. *Wheeler & Ellis* did not pretend that they had obtained a discharge.

In the paragraph omitted by the learned counsel in his quotation, your honors refute an argument which had been urged by the counsel for the defendants, *Wheeler & Ellis*, based upon the decision in the case of *Ray* v. *Cannon*, 2 N. S. 30. In *Ray* v. *Cannon*, it was decided that the Constitutional prohibition of the enactment by the States, of laws impairing the obligation of contracts, did not apply to the insolvent laws of this State, because they were not passed by the State, but had been adopted under the dominion of the government of Spain and the territorial government, and did not come within the terms of the constitutional prohibition. Your honors held that the insolvent laws considered, in the case of *Ray* v. *Cannon*, to wit: the insolvent laws existing here before the formation of the State government had been repealed—that the insolvent laws, with which you had to deal, in the decision of the cause before you, had been adopted since the establishment of our State government, and were therefore within the terms of the Constitutional prohibition.

At all events, we so understand your argument, and beg your honors to refer to the omitted paragraph, or at least such of you as did not take part in the decision.

And it is manifest that the decision of your honors cannot be supported on any other ground, than that the stay of proceedings pleaded by the defendants, was in violation of the Constitutional prohibition. The regularity of the insolvent proceedings was not questioned. The stay of proceedings granted by the Judge, and the purview of the insolvent laws applied as well to foreign creditors and foreign contracts, as to domestic creditors and domestic contracts.

The claim of *Fisher, Burgess & Co.* was clearly within the purview of the stay of proceedings and of the insolvent laws, in pursuance of which that order was granted. And except for the Constitutional prohibition, no reason can be imagined why the stay of proceedings should not have been held effectual.

The learned counsel for the defendant also charges upon us an inaccuracy in our statement of what was controverted, and what was decided in the case of *Boyle* v. *Zacharie et al.* Upon a re-examination of the case, we find we were substantially correct. *Boyle* had obtained his discharge under the insolvent laws of Maryland, on the 31st of December, 1819. In the year 1821, *Zacharie* obtained a judgment against him, which, by agreement, was entered, subject to the legal operation of the discharge under the Maryland insolvent laws. In the year 1827, an execution was issued, which was levied on a ship belonging to *Boyle*, who filed a bill in chancery, praying an injunction of the proceedings under the execution. The injunction was issued, was dissolved upon a hearing, and from the decree of dissolution an appeal was taken to the Supreme Court of the United States. In his bill, *Boyle* alleged "that by the provisions of the insolvent laws of Maryland, (he) the complainant, was entitled to be protected in the enjoyment of all property acquired by him since the date of his discharge under the said insolvent laws; except such as he might have acquired by gift, descent, or in his own right by, bequest, devise, or in any course of distribution, and that he had not, since his discharge aforesaid, acquired any property in any of the modes thus specified." This clearly admits that if he had acquired property by gift, devise, bequest, descent, or in course of distribution, such property would have been liable for the debt, and of course that the debt itself existed to bind the property. We have made every endeavor to get hold of the Maryland statutes, to ascertain the provisions of the law under which *Boyle* obtained his discharge, and failing to find a copy, have examined carefully all the Maryland reports within our reach. And we find indubitable proof that the Maryland insolvent laws did not discharge the debt, but only the person, and such subsequently acquired property of the insolvent as did not come to him by gift, devise, bequest, descent, or in course of distribution.

The effect of the discharge is only to exempt such subsequent acquisitions of the insolvent as are the fruit of his personal exertion. The debt and legal process to collect it are as free as before against all property, but that which is thus exempted, doubtless with a view to promote industry. The policy of the law seems to be merely to give the insolvent a motive to labor.

Thus in the case of *Bowers* v. *Jones*, 1 Gill's Rep., 209, *Bowers* had obtained a judgment against *Jones* in the year 1826. In the year 1831, *Jones* obtained his discharge according to the Maryland statute. The form of the discharge may be seen in that case, p. 212. In 1835 *Bowers* sued out a *scire-facias* upon his judgment, to have execution. *Jones* showed for cause, against the *scire-facias*, that he had obtained his discharge under the insolvent laws, and that he had not since acquired any property by descent, &c. The jury found that the insolvent had acquired property since his discharge, by descent, &c., and the judgment of the Court was "fiat executio."

There were other issues submitted to the jury, and the judgment was appealed from, and the Supreme Court of Maryland delivered a long opinion on other points involved in the cause. On these other points they differed with the lower court, and remanded the cause. But the history of the case in the lower court illustrates the effect of a discharge under the Maryland laws.

In 6 Gill and John., 120, it is said in the argument of Crain, one of the counsel, that "by the fifth section of the Act of 1805, any property acquired by gift, descent, or in any course of distribution, shall be liable to the payment of the insolvent's debts.

In 2 Gill's Reports, 177, will be found the form of a plea adopted by a person who had taken the benefit of the Maryland insolvent laws, and was sued for a debt contracted before his discharge. He pleaded that the plaintiff was only entitled to a qualified judgment to affect future acquisitions by gift, &c.

In 10 Gill and Johnson, 510, is reported a case in which there was a controversy between the trustee of the insolvent, performing the functions of the syndic with us, and his administrator, (the insolvent having died, and letters of administration having been granted upon his estate,) as to the right to a certain fund, which had come to the insolvent in course of distribution. The inferior Court decided that the trustee was entitled to the fund. The administrator appealed. *Mayer*, of counsel for the administrator, contended that the fund in question did not pass to the trustee, but was liable to the separate pursuit of every creditor of the insolvent, each of whom had the same right to proceed against it, which he would have had if no insolvent proceedings had been taken. This argument appears to have prevailed, for the Supreme Court of Maryland reversed the judgment of the inferior Court, and adjudged the fund to belong to the administrator.

In the case of *Gordon* v. *Turner*, 5 Har. and John. 369, an action was brought by a citizen of Maryland on a debt contracted in Maryland, between citizens of that State after the enactment of the insolvent laws, under which the debtor obtained his discharge. The debt was placed on the schedule of the insolvent. The debtor pleaded his discharge in bar of the action, and the inferior Court gave judgment for the defendant. On appeal, the Supreme Court reversed this judgment, and rendered one in favor of the plaintiff. The regularity of the insolvent proceedings was not impugned, so far as the report shows, and the reasons of the judgment do not appear. It is difficult to reconcile this decision with established principles, except upon the ground that the plaintiff was entitled to a judgment, notwithstanding the discharge, in order to enable him to levy on property that might come to the insolvent by gift, bequest, devise, descent, or in course of distribution.

Thus we perceive that the discharge, considered and held to be invalid in the case of *Boyle* v. *Zacharie*, was not a discharge of the debt, as the counsel for the defendant alleges; but merely a discharge of the person of the insolvent and such property as he might acquire after his surrender, otherwise than by inheritance or donation, *inter vivos* or *mortis causa ;* a discharge entirely similar in principle to the kind of discharge pleaded in the case at bar. In both cases the person of the debtor, and a large portion of his future acquisitions are exempt from seizure, or even liability for the debts contracted prior to the surrender. And both systems of law, the Maryland and the Louisiana, afford the creditors a sort of remedy—the Maryland system being, in our humble judgment, much more favorable to the creditor. We never have heard of any creditor's having received a cent from the subsequent acquisitions of a Louisiana insolvent by the remedy provided by our statutes. The Maryland law would certainly, in some cases, pay the creditor out of the insolvent's subsequent acquisitions. There is not a creditor in the world who would not prefer the Maryland law, and yet the Maryland law was declared to be in violation of the Constitution of the United States. And why? Not because it discharged the debt, for we have shown it had no such effect; but because it exempted from liability for the insolvent's debts a large portion of his subsequent acquisitions of property. It did not exempt all, in all cases, no more than does our statute; and that was not the reason why it was declared unconstitutional. And, therefore, it is in vain to endeavor to support the constitutionality of our own insolvent laws by the suggestion that they do not exempt all the insolvent's subsequently acquired property from liability, in all possible cases, but only about as much as he is likely ever to acquire.

The counsel for the defendant argues, that the exemption of certain property of the debtor from liability for his debts, is a familiar thing, as, for instance, the exemption of his tools of trade, his clothing and necessary furniture. Ergo, he contends that the law-makers may properly exempt, from liability for debt, as much of the insolvent's property as is exempted by our insolvent laws. Every system of law, so far as we are informed, exempts from liability some articles of the debtor's property. The law does not sacrifice decency and humanity even to justice. It will not permit the creditor to strip his debtor absolutely naked. But the principle of this exemption is widely different from that which dictates that exemption of the future acquisitions of an insolvent,

which is provided by our law. The law may, with propriety, allow a man bread, clothing, and shelter, even at the expense of his creditors; but to afford him and family a comfortable subsistance as long as any of the generation remain, at the expense of his creditors, is an entirely different thing.

What does the law mean by that provision which allows the insolvent to enjoy, free from the pursuit of creditors, so much of his property as will suffice for the comfortable subsistence of himself and family? It does not mean a comfortable subsistence for a day, month, or year. There is nothing in the provision of the law which limits the period for which the debtor and family are entitled to their support, and we should think that the law means that they and every one of them are entitled to their comfortable subsistence during their lives: that is to say, the insolvent is entitled to hold exempt from the pursuit of creditors such a capital as will yield a revenue sufficient to maintain comfortably all the members of his family, for at least one generation, without the necessity of one single day's labor on the part of any one of them. Could a prince ask more? And yet the law, which allows this, is attempted to be defended on the principle which forbids the creditor to strip his debtor of necessary clothing.

The obnoxious feature of the insolvent laws, declared to be unconstitutional in the cases of *Sturges* v. *Crowninshield*, *Ogden* v. *Saunders*, and *Boyle* v. *Zacharie et al*, was the exemption of the future acquisitions of the debtor from liability for the debt. The opinion of the Judges of the Supreme Court, more particularly expressed in the cases of *Sturges* v. *Crowninshield*, and *Ogden* v. *Saunders*, was, that a debtor in contracting a debt, bound for its payment, not only his present property, but any which he might thereafter acquire during the existence of the debt; and that any law which exempted from liability for the debt so contracted, the property of the debtor, whether owned at the time of its creation or afterwards, during its existence, was a law which impaired the obligation of the contract. And the constitutional objection is not removed by the suggestion that all the subsequently acquired property of the debtor under all possible circumstances, is not exempted. The difference between all, and that which is exempted under our statute, amounts to nothing in a practical view of the matter, and is absolutely no difference as to the constitutional principle involved.

In the case of *Sabatier* v. *his creditors*, 6 N. S. 585, the following question arose: *Brunetti* was a creditor of the insolvent for the amount of an irregular deposite left with the insolvent, while the law gave a privilege to the depositor for the restoration of the subject of the irregular deposite. But before the failure of *Sabatier*, the Civil Code was adopted, which denied a privilege for the security of the irregular deposite, or more properly speaking, abolished that species of contract before that time recognized as the irregular deposite. And the question was, whether or not *Brunetti*, in consequence of that change of the law, had lost his privilege, and it was discussed at great length by *Judge Porter*. He argues, that if the change of the law, provided it were suffered to have effect, would impair the obligation of the contract, then it could not be suffered to have effect. For the Constitution of the United States protects the obligation of the contract. He then proceeds to say: "Now, in the ordinary case of a promise to pay a certain sum of money on a particular day, the obligation of the contract is that the debtor shall discharge the debt at the period fixed, or that, in default thereof, his property shall be responsible to satisfy his engagement. We are aware that a few have contended that there is no implied obligation to make the property liable in a contract of the kind just mentioned; but we apprehend such a ground is quite untenable. Indeed, we do not see how it can be maintained, without reducing the obligation from a legal to a moral one, since a right without a legal remedy ceases to be a right. If by the contract, the property of the debtor did not become and was not, as between creditor and debtor, to be placed out of legislative control, there would be scarcely anything left for the prohibition in the Constitution of the United States to act on. It cannot be believed the framers of it intended to guard against the States passing laws which might add to or take from the amount to be paid and change the time of performance, and leave them a power which would enable them to say, the debtor should be entirely released, both in person and property, from his engagement."

"In the case of *Sturges* v. *Crowninshield*, in the Supreme Court of the United States, it was admitted in argument, that all the present property was responsible to the creditor; but it was urged that the obligation did not go so far as to make future acquisitions subject to it. The Court, however, said that both present and future were; and to release the latter from liability impaired the obligation of the contract. In the case of *Green* v. *Biddle*, they declared that any law introducing a deviation from the terms of the contract, by postponing or accelerating the period of performance, imposing conditions not expressed in the contract, or dispensing with those that were violated by obligation. 4 Wheaton, 122, 8 Wheaton, 1."

"We take it, therefore, as clear, that in the case of an ordinary obligation to pay money, a law passed, subsequent to the contract, which would exempt all a man's property from the payment of the debt, would be unconstitutional; *and that it would be equally so if a part of it was placed out of the reach of execution, provided the portion left liable was not sufficient to satisfy the debt.*"

It cannot be denied that if the defendant had obtained a discharge, and that had been pleaded in bar of our action, there would have been no distinction between the character of the insolvent laws in question and those which have been considered by the Supreme Court of the United States in the leading cases on this subject. The distinction, then, would not have been in the character of the insolvent laws and insolvent proceedings, but if any at all, in the facts of the case. But if we would not be bound in case of an absolute discharge, we ought not to be bound at all. For if a party be bound by judicial proceedings at all, he is bound by whatever result there may be. It cannot be that a party is not bound by the result, if extremely unfavorable, and bound if favorable or less unfavorable.

There is another very simple test. Would the law in question and the discharge under it be valid, as applied to contracts made before the law? That question is most satisfactorily answered in the negative by the decisions in the following cases: *Sabatier* v. *his creditors*, 6 N. S. 585; *Bronson* v. *Kenzie et al*, 1 How. S. C. R. 311; *Green* v. *Biddle*, 8 Wheaton, 1; *Sturges* v. *Crowninshield*, 4 Wheaton, 122; *Farmers' and Mechanics' Bk. of Pa.* v. *Smith*, 6 Wheat. 131. In the latter case, both the plaintiff and defendant were citizens of the State where the contract was made, the law passed, and the discharge had. These decisions all affirm the doctrine, that any law which so impairs the remedy as to make its exercise ineffectual, impairs the right itself, and, if applied to prior contracts, violates the constitution of the United States. Such a law is unconstitutional with regard to prior contracts, even as respects the citizens of States where it may be passed. Now, in *Ogden* v. *Saunders*, we have this additional principle, that a discharge which in its application to prior contracts, is unconstitutional, as among the citizens of the State where it is granted, is unconstitutional with regard to all contracts, whether prior or posterior, as respects the citizens of other States. "For," says the Judge who delivered the opinion of the Court in that case, "the purport of this adjudication, as I understand, is that as between citizens of the same State, a discharge of a bankrupt, by the laws of that State, is valid as it affects posterior contracts; that as against creditors, citizens of other States, it is invalid as to all contracts." Observe also the reasoning of the Court from about the middle of page 365 to the conclusion.

We have so far been discussing the question, whether or not the insolvent acts, so far as the defendant claims their benefit, is a mere lawful modification of the remedy, or a law impairing the obligation of a contract, and whether or not there is anything in the nature of the laws and insolvent proceedings pleaded by the defendant, which distinguish them from those so frequently passed upon by the Supreme Court of the United States. And we think we have conclusively shown that if there be any distinction between the case at bar and those cited and relied on in our brief on file, that distinction is, at least, not to be found in the character of the insolvent laws and insolvent proceedings pleaded. We will proceed presently to inquire whether or not such a distinction is to be found in the facts of the case. But first, we will take the liberty to set the learned counsel for the defendant right as to another matter wherein he has erred.

The learned counsel for the defendant says, that "not a single case has been cited in which a State Court has refused to be governed by its own insolvent

42

laws, when applied to contracts made under them; not one in which it has been held that such laws should not be applied in the Courts of the State. All of the cases relied upon by the plaintiffs were either in Courts of the United States, or in Courts of States other than that in which the insolvent proceedings, set up in defence, had taken place." See the counsel's brief, page 11, also p. 6.

We will furnish a case. In *Savoye et al* v. *Marsh et al*, 10 Metcalf, 594, the cause of action was a promissory note, made in Massachusetts. The suit was brought in a Massachusetts Court, and the defendants pleaded insolvent proceedings had in that State. So far the case is precisely analogous to the one at bar.

It was also similar to this case in another respect. The party through whose endorsement the plaintiffs derived title, were citizens of the same State in which the contract was made and the insolvent proceedings were had, and had no cause of action whatever against the prior parties to the note. For the note was made by *Marsh, Hovey & Glines*, and endorsed by them under the name of *Wm. H. Marsh & Co.*, to the plaintiffs, who were citizens of New York. In its opinion, the Court referred to the case of *Braynard* v. *Marshall*, 8 Pick. 194, with approbation—that very case with which the learned counsel finds fault, and to whose refutation he has invoked the authority of *Judge Story*, citing his work on bills. The Court, in its opinion, dissipated another of the illusions of the learned counsel, that the rule which we invoke was a rule for the Federal Courts, or the Courts of other States than that in which the insolvent proceedings were had, and not a principle of law to be followed by all Courts alike. The Supreme Court of Massachusetts, in the year 1846, with all the lights of arguments and authorities of which the counsel invokes the benefit, decided, "that this restriction upon the power of the individual States, limiting the operation of their insolvent laws to their own citizens, is to be as much regarded by the State judicial tribunals as by the Federal Courts." And they cite 6 Wheat. 131; 1 Bald. 296; 4 Gill. & John. 509, in support of their opinion. To the same point we will cite *Cook* v. *Moffat et al*, 5 How. S. C. Rep. 308. In this latter case the Supreme Court of the United States says, "when this Court has declared State legislation to be in conflict with the Constitution of the United States, and, therefore void, the State tribunals are bound to conform to such decision." But to return to the case in 10 Met. 594. The Supreme Court of Massachusetts proceeds to say: "The case of *Braynard* v. *Marshall*, 8 Pick. 196, was a case where the action was instituted in a different State from that which had enacted the insolvent law; and it may be supposed that, for this reason, the discharge under the insolvent laws of New York was held inoperative in that case; but we apprehend that the decision was placed upon the broad principle that the discharge, under the insolvent law of New York, was held inoperative everywhere, except as against citizens of the State of New York; and that if such suit had been instituted in the State of New York by the same party, (a citizen of Massachusetts,) the tribunals of New York would, under the decisions of the Supreme Court of the United States, have held a discharge obtained under their laws inoperative, as respects a citizen of Massachusetts."

"The promissory note, which is the subject of the present action, (we still quote from 10 Met. 594,) was made by the defendants at Boston, payable in ten days after date, to the order of *W. H. Marsh & Co.*, and endorsed by the payees to the plaintiffs, who then were, and still continue to be citizens and residents in the State of New York. The note was not upon its face made payable at any particular place, and was, therefore, legally payable to the holder. The makers of this note, by giving it a negotiable character, contracted with whomsoever might be the legal endorsee, at the time it became payable, to pay him the same; and the plaintiffs having become such endorsees, it is to all intents and purposes a contract with a citizen of the State of New York, and to be dealt with as any other contract made by a citizen of Massachusetts with a citizen of New York. We are, therefore, of opinion that, upon the facts stated by the parties, the plaintiffs are entitled to judgment." We cited this case for the purpose of showing the error of the learned counsel for the plaintiffs, in saying that there was no case in which a State Court had held a discharge in its own Courts inoperative, and that all the cases relied upon by the plaintiffs were cases decided by the Federal Courts, or the Courts of other States than that in which the insolvent proceedings, pleaded in defence, had taken place.

But your honors will perceive that the decision sustains our action in every particular, and, like the case of *Braynard* v. *Marshall*, proves that the bill upon which we have sued is not payable at any particular place, nor to any particular person, but to any *bona fide* holder, wherever he may reside. And that if such an instrument be transferred to a citizen of another State before its maturity, he can recover upon it, notwithstanding the discharge of the parties thereto under the insolvent laws of the State where the instrument was made, even in the Courts of that very same State.

In further support of our views, there are other cases, if we mistake not, in which the State Courts have held discharges under their own insolvent laws invalid, on the ground of the repugnancy of those laws to the Constitution of the United States.

The case of *Frey* v. *Kirk*, 4 Gill and Johnson, 510, is in point, if we mistake not. This volume is not before us, and it is possible we may be mistaken.

At page four of his brief, the counsel for the defendant says, " the plaintiffs acquired the right of the assignee (*i. e. Mr. Hunton*) and nothing more." We purchased the bill for valuable consideration before its maturity, and at that time there was no defence to it, and we stand upon the same footing with any *bona fide* purchaser of a negotiable instrument, before maturity, without notice. For at that time there was no defence or latent equity of which we could have notice. The defendants seek to charge us with a defence that arose after our purchase, which would have been good against *Mr. Hunton*, had the bill remained his property. This doctrine of the learned counsel is at variance with the law-merchant in relation to negotiable instruments, as we understand it, and was certainly overruled in the cases of *Braynard* v. *Marshall*, 8 Pick., 194; *Towne et al.* v. *Smith*, 1 Woodbury & Minot, 118; *Savoye et al.* v. *Marsh*, 10 Metcalf, 594; *Baker* v. *Wheaton*, 5 Mass., 509; *Watson* v. *Bourne*, 10 Mass. 337. We have, however, argued this point fully in our brief on file.

In the case of *Braynard* v. *Marshall*, the action was upon a note executed by the defendant, who was a resident of New York, in that State, to another resident of the same State, who endorsed it to the plaintiff, a citizen of Massachusetts. Chief Justice Parker says : " The case before us is that of a negotiable promissory note, given in the first place by a citizen of New York to a person resident there, by whom it was immediately endorsed to a citizen of Massachusetts. The defendant had obtained a discharge in the State of New York, the domicil of himself and the payee, and pleaded it in bar of the action." It is true the action was not brought in the State where the discharge was granted, but that circumstance is immaterial, as appears by the decision in the case of *Savoye et al.* v. *Marsh*, 10 Met., 594. The Court, in its opinion, refers to the case of *Ogden* v. *Saunders*, as ruling the one before them, but proceeds to say that, independently of that decision, the defence set up could not prevail. " A negotiable instrument made in New York, and endorsed for a valuable consideration to a citizen of Massachusetts, before an application for the benefit of the insolvent law, ought not to be discharged under the process provided by that law. It is a debt payable anywhere by the very nature of the contract, and it is a promise to whoever shall be the holder of the note." This is the same doctrine held in the case of *Savoye et al.* v. *Marsh*, before cited, and in accordance with the cases of *Baker* v. *Wheaton* and *Watson* v. *Bourne*, also cited.

The case of *Towne et al.* v. *Smith* was a bill of injunction filed by *Towne et al.*, assignees of *Horne* and *Howe*, insolvents, who had taken the benefit of the insolvent laws of Massachusetts, to prevent *Smith* from proceeding at law to collect a debt out of the assets of the insolvents, by attachment in the United States Circuit Court, for the District of Massachusetts. The action enjoined was pending in the same Court. *Smith*, the plaintiff, was a citizen of New York, and his suit was based on a note drawn by by *Horne & Howe*, the insolvents, residents of Massachusetts, payable to their own order, by themselves endorsed in blank, and given to *William A. Howe & Co.*, also citizens of Massachusetts, in payment of a pre-existing debt due them from the makers. *William A. Howe & Co.* carried the note to New York and sold it there, for a good consideration, to *Smith*, who resided in New York. *Smith* commenced his suit against *Horne & Howe*, the insolvents, in the United States Circuit Court for the District of Massachusetts, and attached the property of *Horne & Howe* thereon. *Horne & Howe* applied for the benefit of the insolvent laws of Massachusetts,

NORTHERN BANK
OF KENTUCKY
*v.*
SQUIRES.

were discharged from their debts, and *Towne et al.* were appointed their assignees. *Towne et al.* then filed their bill in equity, praying that *Smith* be enjoined from proceeding with his action. *Judge Woodbury* delivered an elaborate opinion, and concluded by declaring that he was compelled by the authority of the cases decided in the United States Courts, to dismiss the bill of the assignees. This is another case directly in point, the only difference from the one at bar being this, that it was decided by a Federal Court. But we have just seen that this is an immaterial difference.

But we have no doubt, independently of all other considerations, that the case of *Ogden* v. *Saunders* rules the one before the Court. In that case, the seven Judges who sat during the hearing, delivered opinions on the general question of the power of the States to pass insolvent laws. *Judges Washington, Thompson, Trimble* and *Johnson* were of opinion that the States had the power. *Judge Marshall,* with whom concurred *Judges Story* and *Duval,* expressed the opinion that the States had not the power. Afterwards, *Judge Johnson* delivered the opinion which disposed of the case.

He considers the question of the validity of the discharge there pleaded, both in an international and constitutional point of view. In the latter point of view, he contended that the clause of the Constitution of the United States, which gives the Federal Courts jurisdiction of controversies between citizens of different States, was intended to prevent the assertion by State Courts and State laws of the power to discharge, by insolvent proceedings, debts due citizens of other States. See his argument, from page 364 to the end of his opinion. We would be glad to incorporate it in our brief, but that it is too long. The reasoning applies entirely to the present case. You will observe that his position is, that the jurisdiction of the Federal Courts to try suits between citizens of several States, was conferred with a view to protect the citizens of other States from the unfair legislation of any particular State in the way of insolvent laws. And it is important in this connection to remark that the Constitution of the United States confers the jurisdiction to try this case upon the Federal Judiciary, and that we might have brought this suit in the Circuit Court of the United States, but for the failure of the judiciary act to provide for its cognizance by the Circuit Court. The want of jurisdiction in the inferior Federal tribunals, is not owing to the Constitution of the United States, but to the judiciary act. Sec. 2, Art. 3 of the Constitution of the United States, and the following cases: *Turner,* administrator v. *Bank of North America,* 4 Dal.; argument of *Rawle,* of counsel, and remark of *Judge Chase,* in note p. 10, 1 Paine's C. C. R. 45. And by the 25th section of the Judiciary Act of 1789, there is a writ of error to the Supreme Court of the United States from the judgment of your honors if unfavorable to us. So that the argument of *Judge Johnson,* based on the jurisdiction of the Federal Courts, applies with full force.

In conclusion, he says: "I therefore consider the discharge under a State law, as incompetent to discharge a debt due a citizen of another State; and it follows that the plea of a discharge here set up, is insufficient to bar the rights of the plaintiff."    *    *    *    *    *    *    *

"And the purport of this adjudication, as I understand it, is that as between citizens of the same State, a discharge of a bankrupt by the laws of that State is valid, as it affects posterior contracts; that as against creditors, citizens of other States, it is invalid as to all contracts. ⅃

"The propositions which I have endeavored to maintain in the opinion which I have delivered, are these :

"1. That the power given to the United States to pass bankrupt laws is not exclusive.

"2. That the fair and ordinary exercise of that power by the States, does not necessarily involve a violation of the obligation of the contract *multo fortiori* of posterior contracts.

"3. But when in the exercise of that power, the States pass beyond their own limits and the rights of their own citizens, and act upon the rights of citizens of other States, there arises a conflict of sovereign power, and a collision with the judicial powers granted to the United States, which render the exercise of such a power incompatible with the rights of the other States, and with the Constitution of the United States."

The case of *Shaw* v. *Robbins,* 12 Wheaton, 369, in note, was precisely similar, except that it was begun in a State Court, was carried to the highest State Court

to which it could be carried, there decided adversely to the plaintiff, and then to the Supreme Court of the United States, by writ of error, under the provisions of the 25th section of the judiciary act.

At page 348 of 6 Peters, it appears that before the case of *Boyle* v. *Zacharie et al.* came up for trial, *Mr. Wirt*, in behalf of the plaintiff (*Boyle*) in error, "inquired of the Court whether the opinion of *Mr. Justice Johnson*, delivered in the case of *Ogden* v. *Saunders*, 12 Wheat., 213, was adopted by the other Judges who concurred in the judgment in that case."

*Mr. Chief Justice Marshall* said, " the Judges who were in the minority of the Court upon the general question as to the constitutionality of State insolvent laws, concurred in the opinion of *Mr. Justice Johnson*, in the case of *Ogden* v. *Saunders.* That opinion is, therefore, to be deemed the opinion of the other Judges who assented to that judgment. Whatever principles are established in that opinion are to be considered no longer open for controversy, but the settled law of the Court."

In the decision of the same cause, p. 642 of the same volume, *Judge Story*, the organ of the Court on that occasion, makes a similar remark.

But the plaintiffs were not parties to the cession. Their name does not figure on the bilan as that of a creditor. The bill, it is true, is described, and is the first one occurring in the list of bills payable. But *A. S. Trotter*, agent of the Northern Bank of Kentucky, is named as the holder. *Mr. Trotter* had no authority to represent us in any judicial proceeding, and this was a suit by the insolvent against those of his creditors who were placed on his schedule. They were the parties defendant; and if *Mr. Trotter* had no authority to represent us, we are not parties, and would not be so considered, although domiciliated in this State. The agency of *Mr. Trotter* is not shown, and cannot be presumed or inferred from the defendant's own statement to that effect.

*Fortier* v. *Field*, 17 L. R., 587.

*Jacobs* v. *Sartorius*, 3 An., 9.

It has been decided that a holder of negotiable paper is not bound by insolvent proceedings, unless he is placed on the bilan as a party, although the paper itself is described.

*Herring* v. *Levy*, 4 N. S., 383.

*Clarke* v. *Wright*, 5 N. S., 123.

But if it be said that we are properly in court, through the medium of *Mr. Trotter*, as our agent, then he, being a resident of the city of New Orleans, was entitled to notice as a domestic creditor; and it does not appear that any notice was ever given to him or any other creditor.

None of the creditors have ever had the notices required by the law, so far as the record shows, and therefore none of them are bound except those who have made themselves parties voluntarily.

It thus appears the defendant claims the benefit of judicial proceedings, which he conducted against his creditors, without citing any one of them.

But, even if all of our arguments fail, the judgment of the lower Court is still wrong, and not consistent with the reasoning which the learned Judge adduced to support it.

His reasoning goes to show that no State Court in Louisiana can give us a judgment; and yet he does not non-suit us, but declines jurisdiction, and orders our suit to be transferred to the Fifth District Court, and there cumulated with the insolvent proceedings. Why send us to another Court, just as powerless, according to the argument, to give us relief as the one from which we appealed? We pray your honors to give a final judgment for us, if we are entitled to it; but, at all events, a final judgment. According to the views of the Judge of the District Court, the judgment should have been one of non-suit.

*Johnson*, for defendant:

Some weeks after this case was submitted to the late Supreme Court, a supplemental brief was filed by plaintiffs, on the seventeenth page of which a new question of fact is raised. " None of the creditors," it is said, " have ever had the notices required by the law, so far as the record shows, and therefore none of them are bound, except those who have made themselves parties voluntarily. It thus appears the defendant claims the benefit of judicial proceedings, which he conducted against his creditors without citing any one of them."

The plaintiffs show by their corporate name, by the allegations in their petition, and by evidence, for the express purpose of avoiding the effect of the insolvent proceedings whose validity is now for the first time questioned, that they are not and were not domiciliated in this State, and therefore could not be directly cited here. Neither party, on the trial of the case before the District Court, thought of inquiring for the Sheriff's return of notice to the creditors domiciled in the parish of Orleans. The regularity of the proceedings was ad-admitted, as is stated by the District Judge in his opinion. The brief of the counsel for plaintiffs, which he had prepared for the District Court, the only brief on file when the case was tried before this Court, contains no intimation of the existence of any such issue. An appellate Court cannot be called on to decide issues thus first sprung upon it, as if it were a Court of original jurisdiction, long after the submission of the case to it as an appellate tribunal. If it considers the issue material and legally raised at this stage of the proceedings, it is presumed it will remand the case. The missing return, showing notice to the resident creditors, can now be produced. We do not pretend that the plaintiffs were notified as resident creditors. The law says, "if any of the creditors reside out of the territory, the Judge shall appoint a counsel to represent them in the meeting of creditors." Old Code, p. 488, Art. 4, Sec. 3. This is the law referred to in Sec. 8, of the insolvent law of 1817. Art. 3055, of the Code of 1825, not in the Old Code, is declaratory of the law implied in the above citation from the Old Code. "Absent creditors, and who are not domiciled in the State, are not in any case summoned to the meeting. They are to be represented by an attorney, &c."

The record shows that *Mr. Bayne* was appointed, and that he attended the meeting of the creditors and did his duty.

There is another category of creditors entitled to a summons to the meeting of creditors, respecting whom the record, even accompanied by a full sheriff's return, could show nothing. Creditors residing in the State, but out of the parish, are summoned by the notary, by letters addressed to them, but no return, certificate or record of this summons is ever filed in Court. The law, moreover, requires publications in newspapers, calling creditors to attend the meeting, but proof that they were made is never filed in Court, unless called for by some proceedings out of the usual course.

All these steps are essential to the regularity of the proceedings, and the omission of them would probably provoke opposition to the cession in its earliest stage. In the absence of such opposition, in the absence of any charge or allegation impugning the good faith of the insolvent, or his manner of conducting the cession, were we called upon to prove more than that there was a cession, and that the plaintiffs were made parties to it in the only way in which absent creditors can be made parties? The plaintiff's petition and supplemental petition show that they anticipated the defence which was set up, and sought to evade it by invoking the protection of the Constitution of the United States. With such pleadings under our system, we have shown enough to entitle us to the benefit of the presumption *omnia recte acta.* The plaintiff's course corroborates the presumption. If the Court should be of a different opinion, we ask that the case be remanded, that the regularity of the *concurso* may be fully established.

In the long discussion of authorities previously quoted and considered, we shall not follow the supplemental brief. *Savoye* v. *Marsh,* 10, Met. 594, is a new authority, the effect of which could be more correctly estimated, if the clear and concise statement of facts had not been unfortunately omitted. We will supply the omission.

"Assumpsit on this note. Boston, Oct. 3, 1843. Ten days after date we promise to pay to the order of *W. H. Marsh & Co.,* $256, value received.
   (Signed,)                                  MARSH, HOVEY & GLINES."

The parties submitted the case to the Court on the statement of facts which follows; the defendants made the note declared on, and endorsed it by the name of *W. H. Marsh & Co.* to the plaintiffs before its maturity. The defendants then were, and for a long time afterwards continued to be, inhabitants of Lowell in this Commonwealth. The plaintiffs then were and ever since have been co-partners in business, and inhabitants and residents of the State and city of New York."

The rest of the statement shows that two of the defendants obtained, in 1844, a certificate of discharge under the insolvent law of Massachusetts, and that the question submitted to the Court was, whether as to them, under these facts, the plaintiffs could maintain their action.

This is a wholly different case from ours. It comes strictly within the purview of the case of *Ogden* v. *Saunders.* The Court decides it on that ground.

But after disposing of the case on that ground, *Justice Dewey,* who was the organ of the Court, proceeds to make a variety of remarks, some of which, quoted on p. 12 of the supplemental brief of plaintiffs, appear to be founded on a confused idea of the facts of the case, and to be wholly uncalled for in its decision. We have shown that the makers and payees of the note, were one party, and the endorser, the other, with whom the former directly contracted. *Judge Dewey* seems to assume that there were three parties, and that a negociable contract between the first and second, was assigned to the third by endorsement. He then expresses the opinion, that a contract with a fellow citizen, in negociable form, might be discharged by the insolvent act of the State where it was made, so long as the obligee, or any citizen of the same State held it, but would not be so discharged after assignment to one not a citizen of the State. The contract is born with the seeds of destruction in it, but they are rendered inoperative by removal from its native atmosphere. It claims from the Constitution of the United States protection in the hands of one class of citizens, which is denied to it in the hands of another. The law, governing it, is not impressed upon it at the time it is made, but is determinable after-afterwards, at the will of the creditor, and is indeed subject to constant mutations, as nothing prevents a note or bill, or any other contract, from being passed backwards and forwards several times, between the protected and the unprotected classes of holders.

Such is the doctrine of the dicta in this case, and in *Braynard* v. *Marshall,* which the plaintiffs invoke against us, or it is nothing at all. No wonder that *Story* so earnestly refuted it in the Sect. 166 et seq. of his work on Bills, cited in our original brief. If law is a rule, that cannot be law which makes the legal effects and incidents of contracts variable and determinable, at the will of the creditor, at any time after the contract is made.

The facts in *Braynard* v. *Marshall* did not call for such expressions of opinion any more than those of *Savoye* vs. *Marsh.* There was in that case no real party between the New York defendant and the Massachusetts plaintiff, who for goods sold to the former by his agent, received a note of the former, made payable to the agent's order it is true, but immediately endorsed and delivered to the plaintiff, as the defendant was informed it would be. It was a contract in which the consideration moved from the plaintiff, a citizen of Massachusetts, while the obligation was made by the defendant, a citizen of New York, with the knowledge that it was to go to the plaintiff. It was thus within the case of *Ogden* v. *Saunders.* The decision of the case was rested on the ground that a discharge by a New York insolvent law could have no effect in Massachusetts. This is impliedly contrary to the theory propounded in *Savoye* v. *Marsh,* and in *Cook* v. *Moffat,* that a discharge which is good in one forum is good in every forum, and that one which is unconstitutional, is to be held so in the Courts of the State which gave it, as well as in the Courts of the United States, and of those of other States of the Union. We make this observation by the way. The principal object of our remarks on the cases of *Braynard* v. *Marshall,* and *Savoye* v. *Marsh,* is to show that they were in reality like the case of *Ogden* v. *Saunders,* and were decided on grounds not applicable to the case before this Court; that whatever opinions in those cases seem to favor the views of the counsel for plaintiff, are mere dicta, founded on a misconception of the facts, at any rate, uncalled for in either case. These dicta are refuted by *Story,* in the passages cited, not merely by the most cogent reasoning, but by the highest authority. Among the authorities cited by him is that of *Ory* v. *Winter,* 4 N. S. 277.

That the Supreme Court of Massachusetts intends to go no further than the case of *Ogden* v. *Saunders* clearly carries it, and even so far goes unwillingly, is fully and forcibly stated in the late decision made by that Court in the case of *Brigham* v. *Henderson,* 1 Cushing (Mass.) Rep. 430. But not for this reason only do we call the attention of the Court to this case.

In it, the idea that the plaintiff, who resided in Massachusetts when the acceptance was given, could, by removal to New Orleans, avoid the effect of the discharge by the insolvent law of Massachusetts, is ably refuted in this language:

"If his (the plaintiff's) removal from Boston to New Orleans would enable him to avoid the defendant's discharge, so would the removal of a creditor across the line of a State, (however small the distance,) enable him to do the same; thus making the operation of the insolvent law upon contracts made between debtor and creditor, citizens of the Commonwealth, to depend upon the will of the creditor. In the language of the late *Mr. Justice Hubbard*, with reference to another subject, (4 Met. 404,) it will be time enough to yield in this matter of State jurisdiction when the question of right has been determined by the highest tribunal."

What difference would there have been, in our case, between *Mr. Hunton* removing to Kentucky with our acceptance, and his selling it to a citizen of Kentucky? In either case it would be to make "the operation of the insolvent law between debtor and creditor, citizens of the commonwealth, to depend upon the will of the creditor."

There is but one other point that we intend to notice. The counsel for plaintiffs complains that he was not non-suited. But he has not shown in what manner he is aggrieved by a judgment which might, under some circumstances, be more favorable to him than a non-suit, under no circumstances less so.

In giving judgment declining jurisdiction, the Court gave one equivalent to non-suit, and the further order to cumulate the suit with the proceedings in the concurso, in no manner obliges the plaintiffs to pursue their claim there. If he was *not aggrieved by the judgment given*, although it contained surplusage, or an order equivalent to a permission or privilege, of which he does not wish to avail himself, or an order which was incorrect or uncalled for, there is no reason why we should be saddled with the costs of an appeal. The language of Articles 571, 573, 592, 888, 889, C. P, sustains this equitable view. The judgment of the Court says there was a concurso to which you were made a party, and this claim of yours was provable under it. If you have any remedy under that, I give you the benefit of it by referring you to the only Court in Louisiana which can administer it. You have neither alleged nor shown grounds for ordering a new surrender, which is the only case in which this Court could aid you, and, therefore, it dismisses you. We say that this was a proper judgment, that if the reference to another Court was superfluous, it could do the plaintiff no prejudice.

We sum up with the points made in our original brief, and which, we think, we have maintained:

That if we had been discharged under the insolvent act, it would have been no infringement of the Constitution of the United States, and, *a fortiori*, that the modification of the remedy, sole benefit of the Act which we contend for, is constitutional, and should be secured to us by the Courts of the State.

The plaintiff, having failed to show that he was aggrieved by the judgment appealed from, we ask that the judgment be affirmed, with costs.

OGDEN, J. The defendant, a citizen of Louisiana, resists a suit instituted by the plaintiffs, citizens of Kentucky, to recover the amount of a draft accepted by a commercial firm of which he was a member, on a plea in the following words: "That since the execution and protest of said draft, to wit, some time in the year 1850, defendant made a cession of all his property to his creditors, under the provisions of the Act of February 20th, 1817, relative to the voluntary surrender of property, and of the Acts amendatory thereof, and of the Civil Code of Louisiana, to which proceedings the plaintiffs were made parties, under the provisions of said laws—that a stay of all proceedings against the person and property of defendant was granted by order of the Fifth District Court of New Orleans, before which said cession was made, and that said order has never been set aside." The present suit is alleged to be in violation of that order and of the law under which the contract sued on was made. The bill is dated at New Orleans, drawn by *L. Janin*, a citizen of Louisiana, on *Laforest*

& *Squires*, at New Orleans, and made payable to the order of *Benjamin Winchester*, and has on it the blank endorsements of *Benjamin Winchester* and *Miles Taylor*. The parties, whose names are to the bill, were all citizens of Louisiana at the time, and the acceptors were commission merchants residing and doing business in New Orleans. The bill was accepted and endorsed for the accommodation of the drawer, precisely in the shape in which it appears now in the record. *Logan Hunton*, also a citizen of Louisiana, became the owner of it, and sent it to Kentucky, where it was bought by the plaintiffs. The name of *Hunton* is not on the bill.

The case has been argued with much zeal and ability on the question of the effect and validity of the insolvent laws of the State, and the judicial proceedings which have taken place under them, as affecting the right of the plaintiffs, citizens of another State, under the circumstances of this case, to prosecute this suit in a Court of this State, notwithstanding the order staying all proceedings against the person and property of the defendant. A question, however, has been raised in this Court which does not seem to have been considered in the Court below, and which it is necessary first to dispose of. It is denied that the plaintiffs were duly made parties to the proceedings in bankruptcy, instituted by the defendant. This was undoubtedly essential to give validity to the plea which has been set up. The bill is found in the Schedule of defendant's liabilities, and the holder of it is represented to be *A. S. Trotter*, agent of the *Northern Bank of Kentucky*. *Trotter* is not represented as either being present, or residing in New Orleans, and the personal service on him, which the plaintiffs contend should have been shown, we think was not necessary. Counsel was appointed to represent the absent creditors, and that is the only formality required by law to make absent creditors parties in cases of voluntary surrenders. Acts of 1817, p. 130. The bill was then in suit in the United States Court in New Orleans, in the name of the present plaintiffs, and in the description a special reference was made to that suit. The plaintiffs were, therefore, legally parties to the proceedings, and we will now proceed to consider the argument and authorities which have been submitted to us on the merits of the plea.

The order of the Court, made under the authority of a sovereign State, accepting the surrender of defendant's property and staying all proceedings against him, must preclude any creditor from instituting a suit in a Court of this State, unless the law itself is a nullity. The argument of the counsel for plaintiffs is not understood as contending for the absolute nullity of the law, for it seems to be conceded everywhere to be now well settled, that State insolvent or bankrupt laws, as to contracts posterior to those laws, are valid and binding between citizens of the State where such laws exist as to contracts made and to be performed in the State. But the State, in its sovereign capacity, can exercise the fullest authority over its own tribunals, and prohibit citizens of other States from suing in them on contracts made, either in or out of the State, unless there is some superior power by which her authority in this respect is circumscribed. The State has declared her will on this subject. Her insolvent laws expressly extend their operation to all persons, whether citizens of other States or foreigners; and all contracts are declared to be affected by them, whether made in or out of the State, or to be performed in or out of the State. The plaintiffs claim an exemption from the operation of this law as regards them, which they can only be entitled to by showing either that the

43

whole law is repugnant to the constitution of the United States, and, therefore, void, or that by the effect of some clause in the constitution, so much of the law as prohibits them from suing in the Courts of the State, is inoperative. The right of the several States to pass bankrupt laws so long as Congress refrained from exercising the power given to them, by the constitution, of passing uniform bankrupt laws, has never been questioned since the decision in the case of *Sturges* v. *Crowninshield*, 4 Wheaton. It was there held that the States might pass bankrupt laws, provided they did not violate the 10th sect. of the 1st article of the constitution of the United States, which declares that no State shall pass a law impairing the obligation of contracts. *Judge Marshall*, in delivering the opinion of the Court in that case, says, the constitution did not grant to the States the power of passing bankrupt laws, it found them in possession of that power, and restrained them so far as to prevent them from passing laws impairing the obligation of contracts. He also declares, in that opinion, that the insolvent laws existing in the different States at the adoption of the constitution, which went further than discharging the person from imprisonment, were obnoxious to the constitutional prohibition. According to the opinion expressed in that case, the insolvent laws of this State would be repugnant to the constitution of the United States, and would be void, as well in regard to our own citizens as in regard to the citizens of other States. It is, however, well known that the whole subject of the constitutionality and effect of State bankrupt laws came afterwards under review in the leading case of *Ogden* v. *Saunders*, 12th Wheaton—and that it was then decided by the Court, that a discharge under a State law, when the contract was made between citizens of the State under whose law the discharge was obtained, should be held to be valid. In regard to citizens of other States, the Court says: "But when the State passes beyond its own limits and acts upon the rights of the citizens of other States, there arises a conflict of sovereign power, and a collision with the Judicial powers granted to the United States, which renders the exercise of such a power incompatible with the rights of other States and with the constitution of the United States." *Judge Marshall*, who had delivered the opinion of the Court in the case of *Sturges* v. *Crowninshield*, assented to this judgment, and the constitutionality and validity of State bankrupt laws in its effects on posterior contracts to the extent of even entirely discharging the obligation, was established by that decision. The case of *Ogden* v. *Saunders* presented the question, whether *Ogden*, who had obtained a discharge in New York under her insolvent laws, could successfully plead that discharge in bar of a suit instituted against him in the United States Court at New Orleans by *Saunders* on a bill drawn by *Jourdan*, at Lexington, in Kentucky, on *Ogden*, then a citizen and resident of New York, and there accepted by him. The Court held that the fair and ordinary exercise, by the States, of the power to pass bankrupt laws, did not necessarily involve a violation of the obligation of contracts, but that the exercise of that power, as regarded the rights of *Saunders*, a citizen of a different State from the one under whose laws the discharge had been granted, was incompatible with the rights of other States—and held the discharge set up to be invalid. From the language made use of in the propositions, as above stated by the Court, it would seem that they considered the rights of the State to pass such laws as only circumscribed in so much as by the constitution of the United States the Federal Courts were clothed with the power of deciding controversies between citizens of different States. In the

previous case of *Sturges* v. *Crowninshield*, where the same law of New York was held to be unconstitutional, and where the contract was in fact made prior to the law granting the discharge, *Judge Marshall* had deemed it proper to say that the opinion was confined to a case in which a creditor sues in a Court, the proceedings of which the Legislature, whose act is pleaded, had not a right to control; thereby strongly intimating the opinion that the Legislature of the State would necessarily exercise an absolute control, so far as concerned the Courts of the State. It is principally on the reasoning adopted by the Court in the case of *Ogden* v. *Saunders*, and on the authority of the case of *Zacharie* v. *Boyle*, 6 Peters R. 635, together with a decision of *Judge Woodbury*, in the Circuit Court of the United States, and numerous decisions of State Courts— that the plaintiffs' counsel have based their argument to contend that defendant is amenable before our own Courts at the suit of citizens of another State. We have examined the cases referred to, and particularly the case of *Towne et al* v. *Smith*, 1 Woodbury & Minot, 118, in which *Judge Woodbury* has reviewed, at great length, all the decisions on that subject. The result of that examination is, we think it to be settled by judicial authority, 1st. That the insolvent or bankrupt laws of a State, if not suspended by the enactment of a uniform bankrupt law by Congress, are constitutional and valid as to all posterior contracts entered into between citizens of the State where such laws exist, and equally so whether they affect the obligation or the remedy only. 2d. That a discharge granted under such laws, as between citizens of the State where the discharge is granted, and as to contracts made and to be executed there, is valid and binding every where. 3d. That it is only in regard to contracts made between citizens of different States, and not stipulated to be performed in the State where the discharge is granted, that the validity of such discharge can be questioned, if at all, in the Courts of the State where it was granted, although in the Courts of the Circuits of the United States, according to their existing jurisprudence, a discharge, under those circumstances, would not be held good as a plea in bar.

The two first propositions are established by all the authorities, and their correctness now can scarcely be questioned. The third proposition is the one which directly involves the right of the plaintiffs to maintain this action. Their counsel contend that their case is not embraced by it; that the contract sued on was made between a citizen of Louisiana and citizens of Kentucky, and that as no place of performance is indicated in the contract, Louisiana cannot be considered as the place where it was to be performed. They deny, however, the correctness of the legal proposition itself, and say it is immaterial whether the contract was made directly with the citizen of another State or not, and that it would make no difference even if Louisiana was to be considered as the place of performance; and they contend that, although this suit could not be entertained in the Federal Court for the reason that their title to the bill, as shown on its face, is traced through an immediate endorsee, residing in the same State with the maker, yet they are entitled, under the facts and law of the case, to maintain their action in the State tribunals. The first branch of the proposition which is denied by them, viz : that it is only in regard to contracts between citizens of different States that the validity of a discharge, under a State insolvent law, can be questioned, appears to us to be fully established in the case of *Ogden* v. *Saunders*. The case of *Braynard* v. *Marshall*, 8 Pickering, 194, in which it was held that if a note had either been given to a person belonging to

another State, or had been endorsed to one before the discharge issued, the discharge would be no bar when the contract was sued on in the Courts of another State, from that in which the discharge is granted, is not applicable in principle to this case, and if it was, does not appear to be consistent with the doctrine laid down in the case of *Ogden* v. *Saunders*. *Judge Story*, who was one of the Judges who decided that case, has expressed his opinion to that effect. Story on Bills of Exchange, Secs. 166, 167, 168, 169. The second branch of the proposition, viz: that when even the contract is made directly with a citizen of another State, if it is stipulated to be performed within the State where the contract is made, and where the discharge is granted, it is not obnoxious to the constitutional prohibition against a State's passing laws impairing the obligation of contracts, is fairly deducible from the reasoning of *Judge Story* in the case of *Boyle* v. *Zacharie & Turner*, 4 Peters' R., 644. In that case *Zacharie & Turner* having obtained a judgment in the United States District Court at New Orleans against *Boyle*, who was a citizen of Maryland, for money advanced by them on account of *Boyle*, in New Orleans, and which *Boyle* assumed to pay them, proceeded to execute their judgment, and were enjoined by a bill in equity in the Circuit Court of Maryland, on the ground that *Boyle* had obtained a discharge under the Insolvent Act of Maryland. The Court considered the constitutionality of the State insolvent law as settled by the decision in the case of *Ogden* against *Saunders*, but it was contended that the contract upon which the judgment was founded was, in contemplation of law, a Maryland contract, and not a Louisiana contract, and was, therefore, discharged under the Insolvent Act of Maryland. *Judge Story* answered the objection by showing that the contract, on the part of *Boyle*, was to pay *Zacharie* and *Turner* for advances made by them for him in New Orleans, and that the payment, unless otherwise stipulated, would also be understood to be made in New Orleans. He therefore treated the contract as a Louisiana contract, and not as a Maryland contract. It therefore must have been considered by the Court that if Maryland had been the place of performance of the contract by the agreement of the parties, the contract would have been a Maryland contract, and discharged under the insolvent laws. And that view is entirely consonant with the reasoning of the Court by which, in the case of *Ogden* v. *Saunders*, they came to a conclusion in favor of the constitutionality of State bankrupt laws. In the present case, we are of opinion that the contract sued on was a Louisiana contract. It was executed in Louisiana; was made between citizens of Louisiana; and, not being otherwise stipulated, the payments would be understood as intended to be made in Louisiana. We have considered the case as if a discharge had been granted to the defendant by his creditors, because, although a discharge has not been granted, it has been contended that the stay of proceedings granted to the defendant, and the exemption of his future acquisitions to a certain extent from the pursuit of his creditors, which is the consequence flowing from the *cessio bonorum*, does itself materially impair the obligation, and that such is the effect practically, there can be little doubt. We are of opinion, however, that, according to the principles now settled by the highest authority, the validity and effect of our State insolvent laws, and of the judicial proceedings under them, which are pleaded by the defendant, cannot be denied in the Courts of our State under the circumstances of this case. It is not necessary to decide whether we could properly, under any circumstances, nullify the laws of the State so far as they only deny a remedy in our Courts to the citizens of other States, by placing

<div style="text-align: right; font-variant: small-caps;">Northern Bank<br/>of Kentucky<br/>v.<br/>Squires.</div>

them in the same situation with our own citizens. We are not able to see how such laws could be considered as impairing the obligation of contracts entered into between our citizens and the citizens of other States, particularly as the Constitution of the United States has provided tribunals under its own authority for the enforcement of such contracts.

It is, therefore, ordered, adjudged and decreed that the judgment of the Court below be affirmed, with costs.

SLIDELL, C. J. I consider the general rule well settled that State insolvent laws, discharging the obligations of future contracts, are constitutional. It seems to me equally clear that the defendant in this case is protected by our State law. A resident and citizen of Louisiana, he accepted at New Orleans a bill drawn here by a citizen of this State, in favor of and endorsed by a citizen of this State, and negotiated here to a citizen of this State, who afterwards transferred it to the plaintiffs, residents of Kentucky. Not only was the acceptance made here, but the reasonable expectation of all parties must have been that it was to be paid here, where the acceptor lived, and was established as a merchant. I cannot understand by what right this transferee of a Louisiana creditor can ask a Court of Louisiana to disregard its own insolvent laws, and violate a *cessio bonorum*, and a stay of proceeding regularly adjudged in a Court of Louisiana. Such a doctrine, it seems to me, would involve principles subversive of State sovereignty, and for which I find no sufficient warrant in the Constitution of the United States.

I have, therefore, no hesitation in concurring in the affirmance of the decree.